# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| **EDWARD C. McREADY,** | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | Case No.: RWT 08cv2347 |
| | * | |
| **HONORABLE MARTIN O'MALLEY,** | * | |
| ***et al.,*** | * | |
| | * | |
| Defendants. | * | |
| | * | |

## MEMORANDUM OPINION

Plaintiff Edward McReady ("Dr. McReady") was employed by University of Maryland University College ("UMUC") as a Collegiate Associate Professor from December 11, 2005 until August 24, 2007. Plaintiff alleges that his contract was not renewed and that he was terminated for engaging in protected speech, and asserts claims for violations of the First Amendment and Article 40 of the Maryland Declaration of Rights; abusive discharge from public employment; intentional interference with current and prospective contractual relations; defamation; and breach of contract. Defendants, the Honorable Martin O'Malley, UMUC, and various university staff members (collectively "Defendants") moved for summary judgment, and Dr. McReady filed a Cross-Motion for Summary Judgment. ECF Nos. 152 & 159. The motions have been fully briefed and are ripe for resolution. For the reasons stated below, Defendants' motion for summary judgment shall be granted and Dr. McReady's cross-motion for summary judgment shall be denied.

## BACKGROUND

On December 11, 2005, Dr. McReady began employment with UMUC as a Collegiate Associate Professor with initial duties as the Assistant Academic Director of Accounting.

Compl. (9/9/08), ¶ 15. In the spring of 2006, he applied for the Academic Director of Accounting position, but was not selected. He then asked to be removed from the Assistant Academic Director of Accounting position and be appointed as a 12-month, Collegiate Associate Professor at UMUC, which is primarily a teaching position. *Id.* ¶ 14, Defs.' Ex. 2. His request was honored, and Dr. McReady was assigned to teach in the Accounting Department beginning in August of 2006. Defs.' Ex. 2.

In July of 2006, Dr. Rhea Reed was hired as the Academic Director of Accounting. Defs.' Ex. 3 at 3. On August 29, 2009, Dr. Reed advised UMUC Accounting faculty members, including Dr. McReady, that the administration was considering adopting WileyPlus, a software program and collection of online teaching resources, for use in accounting courses. Defs.' Ex. 4.

During the fall of 2006, UMUC instituted a search to fill the vacant Assistant Academic Director of Accounting position that had been vacated by Dr. McReady. On December 20, 2006, Dr. Reed advised Dr. McReady that Dr. Greg von Lehmen, Interim Dean of the School of Undergraduate Studies and Interim Provost of Academic Affairs, was prepared to make an offer to a candidate for the position, and inquired whether Dr. McReady wanted to be inserted into the search for that position. Defs.' Ex. 7 at 32. Dr. McReady declined to be considered for the Assistant Director position at that time. *Id.*

After the candidate selected for the Assistant Director position declined the offer, Dr. McReady was again asked if he wanted to be considered for the position. *Id.* at 27-30. On January 14, 2007, Dr. McReady e-mailed Dr. Reed indicating he would be interested in returning to the Assistant Director position, but requested that they meet to "discuss some aspects of the position, e.g. duties, salary, term of contract, etc." *Id.* at 27. Dr. McReady requested either a higher salary or a three year contract as a condition accompanying his possible re-appointment as

the Assistant Director. *Id.* at 6-18. The administration denied both requests, and informed Dr. McReady on May 8, 2007, that he would be kept in his teaching position, rather than being re-hired as Assistant Director. *Id.* at 6.

That same day, Dr. Reed assigned Dr. McReady to be the course chair for Intermediate Accounting courses. Defs.' Ex. 8 at 8. Dr. McReady questioned whether course chair duties were part of the duties required of him by his contract, and Dr. Reed replied that course chair duties arose from the disproportionately greater pay for 12-month faculty in spite of the similarity in responsibilities between 12-month and 9-month faculty. *Id.* at 7. Dr. McReady initially accepted the course chair duties, but later refused to serve as a course chair. *Id.* at 5.

On May 18, 2007, Dr. Reed informed Dr. McReady of the need to reassign him from a face-to-face section of ACCT 311 to an online section of ACCT 310, so that she could staff a new faculty member, Ira Holmes, to the face-to-face course. Defs.' Ex. 7 at 5. After Dr. McReady responded that he would prefer to keep the face-to-face course, Dr. Reed explained that Ira Holmes needed to be staffed to the face-to-face course because he had not yet taken the computer training necessary to teach the online course. *Id.* at 4. Dr. McReady persisted, writing several emails between May 21st and May 24th challenging Dr. Reed's decision to assign Professor Holmes to the face-to-face course. *Id.* at 3-4.

On May 23rd, Dr. McReady sought the intervention of Dr. von Lehmen and Dr. John Volpe, Assistant Dean of the School of Undergraduate Studies and head of UMUC's Business and Professional Programs Department. Defs.' Ex. 9 at 3. Dr. McReady questioned the "eleventh hour scheduling decision" made by Dr. Reed and stated that Dr. Reed had not "validate[d]" her course scheduling decision. *Id.* Dr. McReady asked for a meeting with Drs. von Lehmen and Volpe because Dr. Reed had "refused to reconsider her decision." *Id.* Drs. von

Lehmen and Volpe declined to meet with Dr. McReady regarding Dr. Reed's scheduling decision and Dr. Volpe informed Dr. McReady that Dr. Reed, "made changes in summer course staffing for the good of the unit." *Id.* at 5. He added, "She and I are counting on your flexibility to pitch in and take on a different assignment." *Id.* Still unsatisfied, Dr. McReady emailed Dr. Volpe challenging Dr. Volpe's assessment that the scheduling changes were for the good of the Department. *Id.* In addition, Dr. McReady argued that Ira Holmes was not capable of teaching the course to which he was assigned because he lacked teaching experience. *Id.* Dr. McReady demanded to know: "**Whether there is any good and justifiable reason why [Dr. Reed] should have assigned one of the most difficult, if not the most difficult, course in UMUC's Accounting courses to an individual who has absolutely no prior teaching experience whatsoever. If so, what is the reason that could possibly justify such a decision?**" *Id.* at 9 (emphasis in original).

At this point, Dr. Reed became concerned with the increasingly hostile tone of Dr. McReady's emails. On May 23, 2007, Dr. Reed and Dr. Volpe discussed via email their concerns about the tone of Dr. McReady's communications and his insubordination. The emails stated:

> Dr. Volpe: "I don't appreciate people that try to go around established chains of command."
>
> Dr. Reed: "Ed's refusal to let this go is starting to concern me – seems over the top doesn't it?"
>
> Dr. Volpe: "Yes. It's troubling. I wouldn't be surprised if he decided to leave."
>
> Dr. Reed: "I would. Where else can he make the $$ he's making here that would give him enough free time to write so many long emails about one decision?"

Dr. Reed: "[I]f he doesn't drop this soon, I'm going on the offensive (i.e., file a complaint somewhere), as I am feeling threatened by this angry-in-the-workplace individual who is overreacting to a routine matter. Perhaps if he became aware of that possibility, he would settle down. What do you think?

Dr. Volpe: "Let him make the next move. He will take his new assignment unflinchingly, take it on but carp and complain throughout, ask for a showdown meeting with [Dr. von Lehmen], Roger and me. I'm betting on one of the latter two possibilities, either of which will not standing him in good stead with any of us."

Dr. Reed: "Thanks. But I hope he really isn't 'angry workplace guy' that ends up losing it! No one ever sees it coming–but after it happens they can all look back and see the indicators."

Defs.' Ex. 9, at 7-8.

After his repeated demands regarding scheduling were denied, Dr. McReady requested to mentor Professor Holmes, and to visit Professor Holmes' class as part of Dr. McReady's course chair duties during the brief period of time that he acted as such. Concerned that Dr. McReady could not be objective when reviewing Dr. Holmes given his persistent objection to Holmes teaching the face-to-face course, Dr. Reed declined Dr. McReady's requests both to serve as Professor Holmes' mentor and to visit his class. Defs.' Ex. 12 at 7-8. On May 29th, in response to an interrogating email regarding when Dr. Reed assigned Professor Holmes another mentor, Dr. Reed forwarded the email to Dr. Volpe and asked, "[h]ow much more of this do I have to put up with?" Defs.' Ex. 11 at 5.

On May 31st, Dr. Reed wrote Dr. Volpe that she was "feeling harassed—even menaced—by the persistence and tone of [Dr. McReady's] email messages to [her.]" Defs.' Ex. 11 at 8. On June 4th, Drs. Volpe and Reed met with Dr. McReady to discuss their concerns with Dr. McReady's persistent refusal to accept the decisions made by Dr. Reed in her role as Academic Director. Defs.' Ex. 12. Dr. Reed testified that the meeting was hostile,

uncomfortable, and confrontational, and stated that at that point she felt afraid to meet alone with Dr. McReady. *Id.* at 13-15.

On June 8th, one day after Dr. Reed placed a late-registering student in Dr. McReady's class, Dr. McReady emailed Drs. Reed and Volpe, "Please remove this student from my course IMMEDIATELY!" Defs.' Ex. 13 at 6 (capitalization in original). Over the next two days, Dr. McReady wrote numerous emails to Dr. Reed and his other supervisors protesting the decision to place the student in his class. *Id.* at 2-6. Eventually, Dr. von Lehmen had the student, referred to as Ms. H, placed in another course as a result of Dr. McReady's intransigence. Defs.' Ex. 14 at 3. In response to Dr. McReady's refusal to accept placement of Ms. H in his course, Dr. Volpe wrote to Dr. Lehmen, "[Dr. Reed] has been having a great deal of difficulty dealing with [Dr. McReady] over the past few weeks. I've seen or been copied on all of his e-mail exchanges with her. He's been very demanding and, in my opinion, discurtious [*sic*], disrespectful and abusive with her to [the] point where she told him if he continues to treat her in the same fashion, she will file a harassment grievence [*sic*]." Defs.' Ex. 14 at 6.

On June 16, 2007, Dr. McReady and other faculty members attended the Business & Professional Programs Symposium at which the WileyPlus program was demonstrated. Defs.' Ex. 15. Following the Symposium, on June 20th, Dr. McReady sent an email to Dr. Reed in which he alleged that Michael Motes and Sheri Levin, both members of the Collegiate Faculty, had a conflict of interest with the adoption of WileyPlus. *Id.* Dr. McReady demanded "Would you please let me know as soon as possible what, if anything, you intend to do about this matter?" Defs.' Ex. 15 at 7. When Dr. Reed did not respond to Dr. McReady's email, he forwarded it to Drs. Volpe and von Lehmen stating that Dr. Reed "apparently intends to ignore my concerns." *Id.*

Meanwhile, on June 18th, Dr. McReady was sent a notice requesting a meeting to be held on June 21st. Defs.' Ex. 16. At the meeting on June 21, 2007, Dr. McReady was informed by Drs. von Lehmen and Davis that his contract would not be renewed when it expired on June 30, 2008. Defs.' Ex. 17 at 2, Pl.'s Ex. 81. On June 22, 2007, Dr. McReady wrote to Dr. von Lehmen requesting reasons for the decision not to renew his contract and indicated his intent to file a grievance regarding the decision. *Id.* Dr. McReady filed a grievance related to the non-renewal decision on July 30, 2007. Pl.'s Ex. 89.

Even after he was informed of UMUC's decision not to renew his contract, Dr. McReady persisted in his complaints about Dr. Reed's decision-making. On the same day that Dr. Reed announced that use of the WileyPlus program for intermediate accounting courses would be mandatory, Dr. McReady sent an email to Dr. von Lehmen, on which Drs. Reed and Volpe were copied, saying "Please say you don't approve of this. As you can see, [Dr. Reed] threatens our employment with the University if we don't use the publisher's software in our classes. If you don't put a stop to this blatant and egregious breach of our Academic Freedom, I will start by including [Dr. Reed's] actions in this regard as part of my grievance with the Provost's Office." *Id.* at 10. In response to Dr. McReady's demand that Dr. von Lehmen state his position on Dr. Reed's decision, Dr. von Lehmen emailed the accounting faculty to indicate his support for Dr. Reed's decision. *Id.* at 16-17. Dr. McReady responded that he was "surprised and disappointed" by Dr. von Lehmen's support of Dr. Reed's decision, and questioned whether Dr. von Lehmen knew enough about accounting to make an educated decision regarding whether WileyPlus would enhance student learning. *Id.* In his response, Dr. McReady continued with the argumentative, bold-faced demands that his concerns be addressed. *Id.* On July 5, 2007, Dr. McReady inquired of Dr. von Lehmen if he would be fired for not using WileyPlus, and

implored Dr. von Lehmen to direct Dr. Reed to waive the mandatory use of WileyPlus for Dr. McReady. *Id.* at 29. Dr. von Lehmen declined to direct Dr. Reed to grant Dr. McReady an exception.

At the same time, Dr. McReady continued to complain about his assignment to teach the online intermediate accounting course after Ira Holmes was assigned to the face-to-face course. On June 28, 2007, Dr. McReady wrote a lengthy email to Drs. Reed, Volpe, and von Lehmen, informing them that he had personally contacted four instructors who would have been willing to accept the online Accounting course to which Dr. McReady had been assigned after Ira Holmes was assigned to the face-to-face version of that course. Defs.' Ex. 10 at 2. Dr. McReady asked, in bold-faced type: "**Did you at any time contact any of our existing experienced ACCT 310/ACCT 311 online instructors to ask them whether they would be interested in teaching the at-issue newly-opened ACCT 310 online course? If not, why not? If so, whom did you contact and what was his/her response?**" Dr. McReady also demanded, again in bold-faced type, "**What was the urgency in assigning [Professor Holmes] to a Summer course? Did you know Mr. Holmes before you interviewed him? Did someone personally recommend Mr. Holmes to you? Etc.?**" *Id.* at 3. Dr. McReady told Drs. von Lehmen and Volpe that they should "direct [Dr. Reed] to respond to the inquiries herein in a straight forward and expeditious manner." *Id.*

On July 11, 2007, Dr. Reed wrote to Dr. Davis, Associate Dean, and Dr. Sax, Assistant Dean:

> "I would like to file a formal complaint. I feel badgered and harassed and intimidated from doing my job by these persistent emails questioning and criticizing everything I do and on which my boss and my boss's boss and others are cc'ed. Also, this whole situation seems so 'over the top' that I do not feel physically safe here anymore – I really feel that [Dr. McReady] is so rabid with bitterness that he could easily snap with little perceived provocation."

Pls.' Ex. 87.

After receiving another demanding and hostile email regarding fall course assignments, on which Drs. von Lehmen and Volpe were copied, Dr. Reed wrote Drs. Lehmen and Volpe, "I am SO tired of [Dr. McReady's] harassing, badgering emails . . . I looked into filing a grievance against him, but find I just do not have the time to fill out all the forms that are required and make a package of all the evidence–too bad we can't employ Ed more fully so that he has less time to harass and badger with his long and persistent emails." Pls.' Ex. 88.

Dr. Reed was not the only target of Dr. McReady's hostile emails in the summer and fall of 2007. In August of 2007, after Dr. McReady experienced a problem with the Text Formatting Editor function of WebTycho, he emailed Dr. von Lehmen stating that the response from the WebTycho helpdesk staff was inadequate and "SHAMEFUL." Defs.' Ex. 22 at 7 (capitalization in original). Dr. von Lehmen responded to Dr. McReady that "someone from [WebTycho] will be in touch with you to sort out." *Id.* Dr. von Lehmen provided Dr. McReady with a "work around" for the issue on August 20, 2007, to which Dr. McReady responded, "Absurd and pathetic, Greg [von Lehmen]! Absolutely absurd and pathetic!!" Defs.' Ex. 22 at 8. Dr. McReady's rant continued:

> "After all the lies and misinformation, do you really expect me to believe that this problem had ever been 'corrected for the fall semester?' And that now 'we are dealing with a new problem which is presenting a similar result . . . ? Once again, Greg, you're questioning my intelligence."

*Id.* at 7-8. The email also stated "Somebody is LYING to somebody, and you should have the COURAGE to get to the bottom of this." *Id.* (capitalization in original). On August 21, 2007, Dr. McReady emailed Dr. von Lehmen stating that he would not have time to incorporate WileyPlus into his fall courses. Defs.' Ex. 22 at 5.

Dr. McReady's contract was terminated for cause on August 24, 2007 because of his willful neglect of duties and insubordination. Dr. McReady's faculty grievance regarding the nonrenewal of his contract proceeded, with the grievance committee concluding that Dr. McReady "did not present clear and convincing evidence to support his claim that the nonrenewal of his appointment was in retaliation for expressing his views on and objections to academic and employment related actions and omissions during the time period May 8 through June 20, 2007." Pl.'s Ex. 101. Dr. McReady appealed the committee's determination. Pl.'s Ex. 103. UMUC President Susan Aldridge upheld the findings of the committee. Pl.'s Ex. 105. Dr. McReady appealed to William Kirwan, Chancellor of the University System of Maryland, asking Dr. Kirwan to review President Aldridge's decision. Pl.'s Ex. 106. Dr. McReady stated that his First Amendment rights had been violated and concluded, "[y]ou will be held accountable." Pl.'s Ex. 106. Dr. Kirwan responded that the decision of President Aldridge was final and not appealable. Pl.'s Ex. 107.

These lawsuits followed.[1]

**PROCEDURAL HISTORY**

Plaintiff McReady has contested nearly every ruling made by this Court—no matter how minor—and to recount each and every procedural twist and turn would require a tome.[2] The most pertinent procedural facts follow.

---

[1] Among the many deficiencies in this lawsuit is Dr. McReady's inexplicable decision to name Governor Martin O'Malley as a defendant. Dr. McReady makes absolutely no allegations that Governor O'Malley engaged in any wrongdoing whatsoever, either in his complaints or in his opposition to Defendants' motion for summary judgment. Governor O'Malley should never have been named as a defendant to this lawsuit.

[2] Dr. McReady has also demonstrated absolutely no respect for this Court's Local Rules, especially with respect to page limitations. Dr. McReady has consistently filed voluminous pleadings in an attempt to circumvent these limits, greatly adding to the size of the record in this case and the time and effort necessary to resolve the present motions.

Dr. McReady[3] filed two Complaints in this Court on September 9, 2008 and September 12, 2008, for the nonrenewal of his contract and the termination of his employment, respectively. Case Nos. RWT-08-cv-2347, RWT-08-cv-2386.[4] Those complaints were consolidated into one case on January 12, 2009. ECF No. 13. Dr. McReady filed two additional complaints on January 11, 2010. Case Nos. RWT-10-0056, RWT-10-0057. The two, January, 2010 complaints were stricken as unauthorized amended complaints filed without leave of Court and in violation of an Order of this Court. ECF Nos. 137, 138.

After the conclusion of a protracted discovery period characterized by frequent, contentious disputes, Defendants filed a Motion for Summary Judgment on June 30, 2010. ECF No. 152.[5] Dr. McReady filed a Cross-Motion for Summary Judgment and opposed Defendants' motion on November 15, 2010. ECF No. 169. Defendants filed an Opposition to Plaintiff's

---

[3] Dr. McReady, who apparently is both an attorney and an accountant, is no stranger to litigation, and this is not the first time that he has been terminated by a local university. *See McReady v. Department of Consumer and Regulatory Affairs*, 618 A.2d 609, 610 (D. C. App. 1992) (noting Dr. McReady's filing of a complaint with the Board of Accounting of the District of Columbia Department of Consumer and Regulatory Affairs after his termination from a local university); *McReady v. Breeden*, 1991 WL 255590 (D.D.C. Nov. 14, 1991) (dismissing age discrimination complaint arising out of Securities and Exchange Commission's decision not to promote Dr. McReady to Staff Accountant position), *aff'd*, 998 F.2d 7 (D.C. Cir. 1993), *cert. denied*, 511 U.S. 1025 (1994).

[4] Dr. McReady also challenged his nonrenewal and termination in the Circuit Court for Montgomery County, Maryland. *See McReady v. University of Maryland University College*, Civil Case No. 302140V (Md. Cir. Ct., filed Oct. 9, 2008); *McReady v. University System of Maryland*, Civil Case No. 302593V (Md. Cir. Ct., filed Oct. 17, 2008); *McReady v. University System of Maryland*, Civil Case No. 304428V (Md. Cir. Ct., filed Nov. 17, 2008). All three cases were dismissed when Dr. McReady failed to follow rules regarding the filing of transcripts, failed to file a memorandum in accordance with Md. Rule 7-207 and failed to appear at the hearing on the merits. He appealed the dismissals to the Court of Special Appeals of Maryland, which dismissed his appeal. *McReady v. University System of Maryland, et al.*, Sept. Term, No. 231, slip op. (Md. Ct. Spec. App. May 14, 2010).

Undaunted, Dr. McReady filed a fourth action in the Circuit Court for Montgomery County, Maryland, seeking judicial review of a decision of the Office of Administrative Hearings that rejected Dr. McReady's claims that the same personnel actions violated the Maryland Whistleblower Law, Md. Code Ann., State Pers. & Pens. § 5-305. The decision of the Office of Administrative Hearings was upheld in a well-reasoned opinion authored by Judge May Beth McCormick that was filed on January 24, 2011. *McReady v. University of Maryland University College*, Civil Case No. 316576V (Md. Cir. Ct., July 12, 2009). A Notice of Appeal was filed by Dr. McReady on March 28, 2011, but appears to have been filed untimely, *see* Md. Rule 8-202(a), which requires that a notice of appeal "be filed within 30 days after entry of the judgment or order from which the appeal is taken."

[5] Plaintiff also filed a motion for summary judgment on June 30, 2010, which was stricken by the Court as it was filed in violation of Local Rule 105.2.c. ECF No. 156.

Cross-Motion for Summary Judgment and Reply to Plaintiff's Opposition to Defendants' Motion for Summary Judgment on December 21, 2010. ECF No. 176. Dr. McReady filed a Reply to Defendants' Opposition to Plaintiff's Cross-Motion for Summary Judgment on January 24, 2011. Defendants' Motion for Summary Judgment and Plaintiff's Cross-Motion for Summary Judgment are ripe for resolution.

## STANDARD OF REVIEW

The Court must grant summary judgment to a moving party if it determines that there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Francis v. Booz, Allen & Hamilton, Inc.*, 452 F.3d 299, 302 (4th Cir. 2006); Fed. R. Civ. P. 56. A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record . . . or . . . showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." F. R. Civ. P. 56(c)(1). "If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for the purposes of the motion." In assessing whether summary judgment should be granted, "[t]he court need consider only the cited materials, but it may consider other materials in the record." F. R. Civ. P. 56(c)(3).

## ANALYSIS

### I.      Free Speech Claims

Despite Dr. McReady's vigorous assertions that he was terminated for exercising his rights to free speech, as guaranteed by the First Amendment to the United States Constitution and Article 40 of the Maryland Constitution, the evidence in the record does not support Dr.

McReady's claims. Rather, the uncontroverted evidence shows that Dr. McReady's hostile emails and insubordinate comments were not protected by the First Amendment or Article 40.

### a. Dr. McReady's speech did not address matters of public concern.

Though "public employees do not surrender all their First Amendment rights by reason of their employment," the First Amendment only protects an employee's speech if the "employee spoke as a citizen on a matter of public concern." *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006). Whether a public employee's speech addresses matters of public concern must be determined by the content, form and context in which the statements were made. *Connick v. Myers*, 461 U.S. 138, 147-48 (1983). The inquiry is not whether the subject of an employee's speech is on a matter that "*could* be of concern to the public" but rather whether the employee's speech was made "primarily in his role as an employee." *DeMiglio v. Haines*, 45 F.3d 790, 805 (4th Cir. 1995) (emphasis in original). "When employee expression cannot be fairly considered as relating to any matter of political, social, or other concern to the community, government officials should enjoy wide latitude in managing their offices, without intrusive oversight by the judiciary in the name of the First Amendment." *Connick,* 461 U.S. at 146. An employee's speech contesting managerial decisions does not touch on a matter of public concern. *See id.*

All of Dr. McReady's speech expressed his personal dissatisfaction with the duties he was assigned and the curricular and staffing decisions of his supervisors. These statements were clearly made in his role as an employee, not as a citizen, and did not touch on matters of public concern. Dr. McReady's complaints about the course chair duties he was asked to perform, Dr. Reed's decision to staff him to an online course, and Dr. Reed's decision to make use of WileyPlus mandatory expressed his displeasure with managerial decisions, and therefore were made in his role as an employee, not as a citizen. *See, Connick*, 461 U.S. at 148 (employee's

distribution of a survey in office expressing her displeasure at being transferred and advocating for changes in office policy was speech made as employee); *Hanton v. Gilbert*, 36 F.3d 4, 7 (4th Cir. 1994) (expressing doubt that employee's complaints about being asked to perform clerical duties addressed a matter of public concern).

Similarly, Dr. McReady's pervasive questioning of the qualifications of Ira Holmes did not touch upon a matter of political, social, or other public concern—Dr. McReady challenged Professor Holmes' qualifications after Holmes was staffed to a course Dr. McReady wanted to teach, indicating that his speech was primarily geared at reversing a managerial decision with which he disagreed. *See Harris v. Merwin*, 901 F. Supp. 509 (N.D.N.Y. 1995) (speech challenging qualifications of another employee not speech on matter of public concern). Nor did Dr. McReady's complaints about having Ms. H enrolled in his course touch upon a matter of public concern, even though Dr. McReady claimed the placement of the student in his class violated his academic freedom. Again, Dr. McReady loudly expressed his displeasure with a managerial decision, but labeling a managerial decision a violation of "academic freedom" does not convert statements protesting that decision into speech concerning a matter of public concern. *Cf. Urofsky v. Gilmore*, 216 F.3d 401, 414 (4th Cir. 2000) ("To the extent the Constitution recognizes any right of 'academic freedom' above and beyond the First Amendment rights to which every citizen is entitled, the right inheres in the University, not in individual professors.")

Dr. McReady's accusation that members of the faculty had "conflicts of interest" associated with the adoption of WileyPlus was also not speech on a matter of public concern. An employee's allegations that other employees engaged in misconduct is speech made as an employee, not as a citizen. *See, e.g. Barnes v. Small*, 840 F.2d 972, 982 (D.C. Cir. 1988)

(plaintiff's reports of alleged misbehavior of coworkers and superiors was not speech touching upon a matter of public concern).

There is simply no evidence in the record that Dr. McReady spoke as a citizen on a matter of public concern. Rather, the record reveals that Dr. McReady made increasingly hostile statements about managerial decisions he found disagreeable or unwise. Such speech was not entitled to First Amendment protection. Rather, it was wholly unprotected insubordination that his academic employers should not, and did not, tolerate.

> **b. Defendants' interest in maintaining an orderly work environment and uniform curriculum outweighed McReady's speech interests.**

Even if Dr. McReady had spoken on matters of public concern, it is clear that UMUC's interest in maintaining an orderly accounting department and uniform accounting curriculum outweighed any interest Dr. McReady had in making his vitriolic tirades against each and every decision made by his superiors. If an employee's speech "impairs discipline by superiors or harmony among coworkers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise," the employee's speech interests will likely be outweighed by the employer's interests in maintaining order and efficiency. *Rankin v. McPherson*, 483 U.S. 378, 388 (1987).

It is clear that Dr. McReady's constant challenging of the decision-making authority of Dr. Reed and others threatened the ability of those individuals to maintain discipline and ensure the efficient operation of UMUC's accounting department. Each time Dr. Reed made a curricular or staffing decision with which Dr. McReady disagreed, he sent a long, contentious email to her, her supervisors, or other accounting professors challenging the wisdom of that

decision. These persistent challenges to Dr. Reed's decision-making authority spanned months and grew increasingly hostile. Dr. McReady frequently demanded his superiors address his concerns with the decisions they had made. Dr. McReady's persistent refusal to accept the curricular and staffing decisions made by his superiors clearly undermined UMUC's ability to maintain discipline in the accounting department. Dr. McReady's conduct left Dr. Reed feeling threatened and harassed, a result that clearly impaired her ability to effectively run the accounting department. Moreover, Dr. McReady's habit of copying multiple members of the accounting department on his lengthy, insubordinate emails surely interfered with other professors' abilities to do their jobs. Finally, Dr. McReady's refusal to accept the adoption of WileyPlus threatened the accounting department's interest in maintaining a uniform curriculum. *See Scallet v. Rosenblum*, 911 F. Supp. 999, 1016 (W. D. Va. 1996) (professor's speech interests were outweighed by university's interest in maintaining uniform curriculum). UMUC's interest in maintaining discipline and efficiently administering the accounting department clearly outweighed Dr. McReady's speech interests.

### c. Defendants are entitled to qualified immunity.

It is clear that Dr. McReady's speech interests were not violated by UMUC's decision to terminate his contract as a result of his persistent insubordination. However, even if Dr. McReady's speech interests outweighed the university's interests in maintaining discipline and order in the accounting department, Defendants are entitled to qualified immunity. Government officials are protected by qualified immunity and shielded from liability "as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated." *DiMeglio v. Haines*, 45 F.3d 790, 794 (4th Cir. 1995). Where the free speech rights Defendants

allegedly violated were not clearly established at the time their challenged actions were taken, they are entitled to qualified immunity. *Id.* at 805.

Here, Dr. McReady's speech was not entitled to First Amendment or Article 40 protection because he did not speak on matters of public concern. Further, even if his speech touched on matters of public concern, UMUC's interest in maintaining order and efficiently administering the accounting department outweighed Dr. McReady's speech interests. Even if UMUC's interest in disciplining Dr. McReady and preventing rank insubordination did not outweigh Dr. McReady's speech interests, the right to write pervasive, hostile emails to one's superiors challenging managerial decisions was not clearly established at the time Dr. McReady was terminated, and it is unlikely that such a right will ever be recognized. Accordingly, Defendants are protected by qualified immunity, and are therefore entitled to summary judgment on Dr. McReady's free speech claims.

## II. Defamation

### a. Dr. McReady fails to state a prima facie case of defamation.

"To establish a *prima facie* case of defamation when the plaintiff is not a public figure, the plaintiff must prove: (1) that the defendant made a defamatory communication to a third person; (2) that the statement was false; (3) that the defendant was at fault in communicating the statement; and (4) that the plaintiff suffered harm." *Samuels v. Tschechtelin*, 763 A.2d 209, 242 (Md. App. 2000).

An individual cannot be held liable in defamation for a statement of opinion—a defamation claim must be premised on a false statement of fact. *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 339-40 (1974) ("Under the First Amendment there is no such thing as a false idea. However pernicious an opinion may seem, we depend for its correction not on the conscience of

judges and juries but on the competition of other ideas.")  However, opinions that "imply an assertion of objective fact" can form the basis of a defamation claim.  *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 18 (1990).  Any statement capable of being proved or disproved is a statement of fact, rather than opinion.  *Tchectelin*, 768 A.2d at 244.

Plaintiff must demonstrate Defendants' fault by showing that they made the allegedly defamatory statements negligently or maliciously.  *Tchectelin*, 763 A.2d at 242.  If a statement is defamatory *per se*, and the defendant was negligent in making the false statement, plaintiff must prove he suffered actual damages.  *Id.* at 245.  If a statement is defamatory *per se* and the plaintiff can demonstrate actual malice by clear and convincing evidence, damages are presumed.  *Id.*  "Actual malice is established when the plaintiff shows, by clear and convincing evidence, that the defendant published the statement in issue either with reckless disregard for its truth or with actual knowledge of its falsity."  *Id.* (internal quotations omitted).

Dr. McReady has cited absolutely no evidence supporting his claim that the statements made by Defendants were false; that they acted negligently or maliciously in making them; or that he suffered harm as a result.  Dr. McReady failed to even brief his defamation claim, and this is not surprising because there is absolutely no evidence in the record that Defendants defamed Dr. McReady.

As an initial matter, certain of the allegedly defamatory statements made by Defendants were statements of opinion, and hence cannot form the basis of a defamation claim.  Dr. Reed's statements that she perceived Dr. McReady as an "angry workplace guy" who was "rabid with bitterness" were statements of opinion, incapable of being proven true or false.  Defs.' Ex. 9, Ex. 12.  These statements clearly reflected Dr. Reed's personal beliefs and perceptions of Dr. McReady rather than objective statements of fact.  How one could objectively be proven to be

"rabid with bitterness" as a matter of *fact* is beyond the Court. Similarly, Dr. Volpe's June 8, 2007 email to Dr. Von Lehman stating that Dr. McReady "[has] been very demanding and, in my opinion, discourteous [*sic*], disrespectful and abusive with [Dr. Reed] to [the] point where she told him if he continues to treat her in the same fashion, she will file a harassment grievance [*sic*]," was a statement of opinion. Defs.' Ex. 14. One's personal belief that another is acting in a demanding and disrespectful fashion is clearly a subjective statement of opinion. Dr. Volpe's email to Dr. Mack, UMUC's Registrar, regarding the necessity of moving Ms. H to another class was also a statement of opinion. Dr. Volpe wrote: "It galls me that we might have to move [Ms. H. to another class], because [Dr. McReady] is not a team player." Compl., 9/9/08 ¶ 63. Dr. Volpe's belief that Dr. McReady was "not a team player" is exactly the kind of subjective statement of personal belief that cannot be proven true or false. As these statements were statements of opinion, they cannot form the basis of a defamation claim.

The remainder of the statements Dr. McReady alleges to be defamatory are statements of fact, but are not defamatory as Dr. McReady has not shown that they were false. With respect to Dr. Reed's statements that she felt harassed and threatened by Dr. McReady's conduct, there is simply no genuine dispute that Dr. Reed *in fact* felt that way. Dr. Reed testified that she felt threatened by Dr. McReady's hostile emails to the extent that she no longer felt safe meeting alone with him. Defs.' Ex. 12, at 7-9, 13-15. Indeed, given the repetitive and increasingly hostile nature of Dr. McReady's emails to Dr. Reed, it is not surprising that Dr. Reed felt that way. Dr. McReady has put forth absolutely no evidence calling into question Dr. Reed's veracity in stating she felt threatened and harassed by Dr. McReady's conduct. *See* Defs.' Ex. 9, 11, 12. (Emails from Dr. Reed stating she did not "feel physically safe [at UMUC] anymore," that she was "SO tired of [Dr. McReady's] harassing, badgering emails . . . . ," and stating "I am

feeling harassed—even menaced—by the persistence and tone of Ed's email messages to me")
Nor can Dr. Reed's statement that she looked into filing a grievance against Dr. McReady be the
basis of his defamation claims.  Dr. McReady has not suggested that Dr. Reed did not actually do
just that.

Dr. McReady also claims that an email sent to students stating that he failed to return
their final exams was defamatory.  The September 4, 2007 letter to students regarding their final
grades was not defamatory.  In relevant part, the letter stated "Mr. McReady had been given the
information and the opportunity needed to report final grades.  He has declined to use the
information provided, has not reported any final grades, and has not returned the examinations to
the university so they could be graded by a qualified faculty member.  We are sorry that he has
not done so."  In a later letter to a student regarding the grading situation, UMUC employee
Shawna Acker-Ball stated "In light of the fact that Mr. McReady would not grade the exams and
would not return the exams to UMUC, we had to find a solution that would assist students in
receiving final grades for Mr. McReady's classes and be consistent with past grading practices in
the class."

Neither of these statements is defamatory.  Dr. McReady puts forth no evidence that
these statements were false; that is, he cites no evidence in the record that shows that he did not
decline to grade the exams or return them to UMUC.  Dr. McReady's assertions that he was
willing to grade the final exams are not supported by citation to particular materials in the record,
and the Court therefore deems the facts undisputed for purpose of the parties motions for
summary judgment.  F. R. Civ. P. 56(e)(2) ("If a party fails to properly support an assertion of
fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the
court may . . . consider the fact undisputed for purposes of that motion . . . ")

Further, Dr. McReady has not presented any evidence that Defendants' statements harmed him. The Court will presume Dr. McReady claims that the defamatory statements led to the non-renewal of his contract and his termination, or in some way impaired his future job prospects. A plaintiff suffers harm where defamatory statements led to lost present or future job opportunities. *Tschectelin*, 763 A.2d at 241. However, there is no support in the record for Dr. McReady's claim that Dr. Reed's *statements*—rather than his emails to Dr. Reed, on which numerous members of the faculty were copied, and the insubordinate emails he sent to other faculty members questioning Dr. Reed's decision-making—were the reason for Dr. McReady's termination. Dr. McReady copied many members of the faculty on his hostile emails to Dr. Reed, and they were therefore aware of the hostile and threatening tenor of these emails, absent any comment on the nature of those emails by Dr. Reed. *See* Defs.' Ex. 8 at 4-5, Ex. 9 at 3, 9, Defs.' Ex. 10, Defs.' Ex. 11, at 11, Defs.' Ex. 13.

Furthermore, Dr. McReady was terminated not only because his emails to Dr. Reed grew increasingly hostile, but also because he refused to follow a directive from his supervisors to use WileyPlus. *See, e.g.* Defs.' Ex. 17 (email from Dr. McReady to Dr. von Lehmen stating "Am I going to be fired if I don't wish to use WileyPlus or not? . . . If you are going to fire me and not offer me any other courses so that I can fulfill the terms of my contract, I will use WileyPlus."), Defs.' Ex. 22 at 5 (Dr. McReady's statement that he "won't have time to incorporate WileyPlus into my classes this semester as you have demanded.")

There is simply no evidence in the record that Dr. McReady was fired because Dr. Reed told her superiors that she felt threatened by Dr. McReady. Rather, the only reasonable inference from the evidence put forward by the parties is that Dr. McReady was indeed terminated because he wrote numerous, hostile emails to Dr. Reed and others, repeatedly expressed his disagreement

with her decisions to her superiors, and refused to use WileyPlus when asked. Dr. McReady puts forward absolutely no evidence to support his claim that allegedly defamatory statements interfered with his present or prospective employment. Rather, the record only demonstrates a pattern of repeated, insubordinate behavior by Dr. McReady, behavior that ultimately interfered with the educational mission of the University of Maryland. Therefore, Defendants are entitled to summary judgment on Dr. McReady's defamation claim.

### b. Defendants are entitled to statutory immunity.

Pursuant to the Maryland Tort Claims Act, Maryland state employees "are immune . . . from liability in tort for a tortious act or omission that is within the scope of the public duties of the State personnel . . . and is made without malice or gross negligence." Md. Code, Cts. & Judic. Proc. § 5-522(b). "Section 5-522(b)'s phrase, 'within the scope of the public duties of the State personnel,' for purposes of a State official's or employee's immunity from suit under the Maryland Tort Claims Act, generally 'is coextensive with the common law concept of "scope of employment" under the doctrine of respondeat superior.'" *Larsen v. Chinwuba*, 832 A.2d 193, 200 (Md. 2003). State employees are thus entitled to this statutory immunity when sued for making defamatory remarks within the scope of their employment. *See id.* at 201-02 (statements made within the scope of Insurance Commissioner's employment were entitled to statutory immunity).

The email communications between members of the UMUC faculty regarding Dr. McReady's hostile behavior and insubordination were clearly made within the scope of their employment. Discussing a subordinate's refusal to follow directives and his hostile manner with his supervisor are exactly the types of communications necessary to the efficient administration of any business enterprise, including a university. Thus, even if the comments made by members

of the UMUC faculty were defamatory, their communications to each other in this case are clearly entitled to statutory immunity under the MTCA.

Similarly, communications made to students regarding their final grades in Dr. McReady's course were made within the scope of UMUC personnel's employment. Communicating with students regarding their grades in a course is clearly a necessary function of a university. Accordingly, Defendants are entitled to qualified immunity with respect to each and every communication Dr. McReady claims is defamatory.

### c. Defendants' statements are entitled to a qualified privilege.

A defendant may escape liability for a defamatory statement if publication of the utterance enjoyed a qualified privilege. *McDermott v. Hughley*, 561 A.2d 1038, 1046 (Md. 1989). A statement is accorded a qualified privilege "when the occasion shows that the communicating party and the recipient have a mutual interest in the subject matter, or some duty with respect thereto." *Id.* Parties who share a common interest in professional dealings may share a "common interest" sufficient to invoke the privilege. *Gohari v. Darvish*, 767 A.2d 321, 329 (Md. 2001). Further, statements made within the employer-employee relationship share a well-settled qualified privilege. *Happy 40 Inc. v. Miller*, 491 A.2d 1210, 1214 (Md. 1985). A qualified privilege is lost only where it is abused, that is, where the defamatory statement is made with malice; where the statement was not made in furtherance of the mutual interest for which the privilege exists; where the statement is made to a third party other than those whose hearing is reasonably necessary or useful to the protection of the mutual interest; or where the statement contains defamatory material not reasonably believed to be in line with the purpose for which the privilege exists. *Carter v. Aramark Sports and Entertainment Svcs., Inc.*, 835 A.2d 262, 281 (Md. App. 2003).

The communications between Dr. Reed, Dr. von Lehmen, and Dr. Volpe regarding Dr. McReady's increasingly hostile communications with Dr. Reed and insubordination in the face of her decision-making are clearly entitled to a qualified privilege. These statements were made within the scope of the parties' employment relationship—Dr. Reed and her supervisors communicated with one another regarding a subordinate's hostility and insubordination. Dr. Reed and her supervisors had a mutual interest in ensuring the effective functioning of the accounting department—an interest undermined by Dr. McReady's persistent insubordination.

Moreover, there is absolutely no evidence that this privilege was abused. Dr. Reed's statements that she felt harassed and threatened by Dr. McReady's behavior were not malicious; she testified that she genuinely felt threatened and harassed by Dr. McReady's conduct. Defs.' Ex. 12 at 8, 17. Dr. McReady cites to no evidence in the record to support his claim that statements made by other UMUC employees were malicious. All communications regarding Dr. McReady's hostile behavior were limited to a core group of UMUC administrators whose assistance was necessary to address his behavior, and every statement made by UMUC faculty members was in line with the goal of minimizing the impact of Dr. McReady's behavior on the effective functioning of the accounting department. The privilege was not abused.

### III. Intentional Interference with Prospective and Current Contractual Relations

The tort of intentional interference with contractual relations "is committed when a third party's intentional interference with another in his or her business or occupation induces a breach of an existing contract or, absent an existing contract, maliciously or wrongfully infringes upon an economic relationship." *Macklin v. Robert Logan Assocs.*, 639 A.2d 112, 117 (Md. 1994). The Court strains to conceive of a claim premised on the idea that Defendants' actions interfered with McReady's contract *with UMUC.* Under Maryland law, a tortious interference with

contractual relations claim fails as a matter of law if the actor who is interfering with the relationship is an agent of one of the actors in the relationship. *Byington v. Vega Biotechnologies, Inc.*, 869 F. Supp. 338, 342 (D. Md. 1994). Therefore, the actions of UMUC's agents—including Drs. Reed, von Lehmen, and Volpe—cannot form the basis of an intentional interference with contractual relations claim. Every action that Dr. McReady alleges constituted an interference with his employment with UMUC was done by an agent of UMUC, and Dr. McReady's claim for intentional interference with current contractual relations therefore fails as a matter of law.

Dr. McReady has also failed to present any evidence that Defendants' actions interfered with his prospective contractual relations, that is, his ability to obtain another teaching position after Defendants decided not to renew his contract and later terminated his employment. "To establish tortious interference with prospective contractual relations, it is necessary to prove both a tortious intent and **improper or wrongful conduct**." *Id.* (emphasis added). Dr. McReady fails to support his claim that Defendants engaged in any improper or wrongful conduct; indeed, the record reveals that Defendants' termination of Dr. McReady's employment was wholly justified. His emails were insubordinate at best, and at worst reflected a dangerous and growing hostility to his supervisors. Dr. McReady consistently refused to follow directives from Dr. Reed, his immediate supervisor. He questioned nearly every academic decision she made—from her decision to staff Professor Holmes to an intermediate accounting course to her decision to mandate the use of WileyPlus. Dr. McReady's emails varied in tone from demanding to overtly hostile, but rarely complied with normal standards of respectful, professional discourse. Finally, Dr. McReady cites no evidence in the record supporting his claim that his future economic opportunities were impaired by Defendants' actions.

Even if Dr. McReady had provided a shred of evidence that his job opportunities were impaired by Defendants' actions, Defendants would be entitled to sovereign immunity pursuant to the Maryland Tort Claims Act. As discussed, *supra*, state personnel are protected by sovereign immunity for tortious acts made within the scope of their employment so long as the tortious act was not done with malice or gross negligence. Md. Code, Cts. & Judic. Proc. § 5-522(b). There is no evidence that any of the Defendants to this action acted maliciously or grossly negligently in deciding not to renew Dr. McReady's contract and in terminating him from employment Defendants are entitled to summary judgment on this claim.

## IV. Abusive Discharge

"[A]n employee who is dismissed for raising objections to the employer's business, management or safety practices, even if correct in his or her allegations, does not state a cause of action for abusive discharge." *Lee v. Denro, Inc.*, 605 A.2d 1017, 1023 (Md. App. 1992). Even if an employer does not have a good reason for discharging an employee, the employee's discharge is not "abusive" under Maryland law unless the discharge is in clear violation of public policy. *Id.* at 1024. The Fourth Circuit has held that abusive discharge claims should be limited "to situations involving the actual refusal to engage in illegal activity, or the intention to fulfill a statutorily prescribed duty." *Adler v. American Standard Corp.*, 830 F.2d 1303, 1307 (4th Cir. 1987). In decisions after *Adler*, the Maryland appellate courts have not found an abusive discharge claim to be stated "absent a discharge which violates a public policy set forth in the constitution, a statute, or the common law." *Denro*, 605 A.2d at 1021.

Dr. McReady's abusive discharge claim is premised on his claim that his contract was not renewed and he was discharged for exercising his First Amendment and Article 40 rights to free speech. *See* Compl., 9/9/08, at ¶ 110-111. As discussed, *supra*, UMUC's non-renewal decision

and Dr. McReady's discharge did not violate his First Amendment or Article 40 free speech rights. Accordingly, there is no evidence that non-renewal of Dr. McReady's contract and his eventual termination violated the First Amendment or Article 40 of the Maryland Constitution. Defendants are entitled to summary judgment on Dr. McReady's abusive discharge claim.

Even had Dr. McReady produced evidence suggesting that his discharge violated public policy—which he has not—Defendants would be protected by sovereign immunity. So long as Defendants' allegedly tortious discharge of Dr. McReady was done without malice or gross negligence by state personnel acting within the scope of their employment, they are protected by sovereign immunity under the Maryland Tort Claim Act. Defendants are entitled to summary judgment on Dr. McReady's abusive discharge claim.

## V. Breach of Contract

Under Maryland law, a contract for a definite term may only be terminated for just cause. *Tricat Industries, Inc. v. Harper*, 748 A.2d 48, 62 (Md. App. 2000). An employer's decision to terminate an employee is not a breach of contract so long as the employer acted "in objective good faith and base[d] its decision on a reasoned conclusion and facts reasonably believed to be true." *Himes Associates, Ltd. v. Anderson*, 943 A.2d 30, 50 (Md. App. 2008). An employer's loss of faith and trust in an employee and incompatibility between the employer and the employee can support termination for cause. *Shapiro v. Massengill*, 661 A.2d 202, 210 (Md. App. 1995). An employee's insubordination or failure to obey orders can provide just cause for termination. *See, e.g. Silkworth v. Ryder Truck Rental, Inc.*, 520 A.2d 1124, 1128 (Md. App. 1987) (employee's refusal to change tire as directed by supervisor supported "for cause" dismissal).

The evidence in the record leaves no doubt that Dr. McReady's termination was based on his hostile communications with members of UMUC's administration and his insubordination to his superiors, as reflected in his refusal to accept Dr. Reed's decision-making authority and his refusal to use WileyPlus as directed. Dr. McReady's insubordination and harassment of his superiors provided just cause for UMUC's termination of his contract, and Dr. McReady's breach of contract claim fails as a matter of law.

## CONCLUSION

In the final analysis, this case has nothing to do with freedom of speech or academic freedom. Rather, it is a routine case of nonrenewal and termination of a clearly insubordinate employee who simply refused to comply with the directives of UMUC's administration, and to conform his conduct with curricular decisions they made. Defendants' decision not to renew Dr. McReady's contract and their decision to terminate him were the inevitable result of his improper, threatening, insubordinate behavior, and did not violate Dr. McReady's rights—constitutional, contractual, or otherwise. Indeed, it is hard to fathom how any other decisions could have been made in the face of Dr. McReady's behavior without seriously interfering with the educational mission of the University of Maryland. Defendants are thus entitled to summary judgment as a matter of law.


March 31, 2011                            /s/
Date                                      Roger W. Titus
                                         United States District Judge